IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) HAROLD MEASHINTUBBY and<br>(2) NELLIE MEASHINTUBBY,<br><br>    Plaintiffs,<br><br>vs.<br><br>(1) SHELLY PAULK, Chairperson of the Oklahoma Tax Commission;<br>(2) MARK WOOD, Vice-Chairperson of the Oklahoma Tax Commission;<br>(3) CHARLES PRATER, Secretary-Member of the Oklahoma Tax Commission,<br><br>    Defendants. | Case No.: 22-cv-059-KEW |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Before the Court are Plaintiffs Harold and Nellie Meashintubby, and, for their Complaint for declaratory and injunctive relief against Defendants Shelly Paulk, Chairperson of the Oklahoma Tax Commission ("OTC"), Mark Wood, Vice-Chairperson of the OTC, and Charles Prater, Secretary-Member of the OTC, allege and state as follows:

### I.  INTRODUCTION

In *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164 (1973), the U.S. Supreme Court held that, absent express congressional authorization, a State could not subject a tribal member living on a reservation whose income was derived from reservation sources to a state income tax. The Supreme Court has since further clarified the rule as a categorial approach on the limits of State authority to tax in Indian country: "Absent cession of jurisdiction or other federal statutes permitting it, a State is without power to tax reservation lands and reservation Indians." *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 1      **Reservation Legal Solutions, PLLC**
P.O Box 1131
Okmulgee, Oklahoma 74447
(918) 752-0020

On July 9, 2020, the U.S. Supreme Court issued its ruling in the landmark case of *McGirt v. Oklahoma*, 140 S.Ct. 2452 (2020) and held that the boundaries of the reservation lands promised to the Muscogee (Creek) Nation through treaties were never disestablished and are Indian country lands as defined under 18 U.S.C. § 1151. Even though *McGirt* involved a criminal jurisdiction question under the Major Crimes Act, the Indian country classification for the reservation lands applies to both civil and criminal jurisdiction issues. *See, e.g., Indian Country, U.S.A. Inc. v. State of Okl. ex rel. Oklahoma Tax Comm'n*, 829 F.2d 967, 973 (10th Cir. 1987).

The *McGirt* reasoning and analysis have since been applied to recognize the continuing existence of other Indian reservations in Oklahoma. In *Sizemore v. Oklahoma*, 2021 OK CR 6, the Oklahoma Court of Criminal Appeals affirmed the lower court's determination that various treaties established the Choctaw Reservation for the Choctaw Nation, and that those reservation boundaries were never disestablished by Congress. The Court concluded that all land within the exterior boundaries of the entire Choctaw Reservation is Indian country.

In this action, Plaintiffs are individual enrolled members of the Choctaw Nation of Oklahoma who reside and earn income from sources within the exterior boundaries of the Choctaw Reservation. Plaintiffs thus fall squarely within the law preempting the State of Oklahoma from assessing, levying, and collecting tax, including penalties and interest, from their income.

Defendants are individuals who are authorized under the laws of the State of Oklahoma to administer and enforce State tax laws and policy. 68 Okla. Stat. § 101, *et. seq*. Despite recent Federal and State court rulings affirming that the Reservation boundaries of certain Tribes in Oklahoma were never disestablished by Congress, Defendants continue to assert that these Reservation lands are not Indian country to exempt Tribal members' income tax.

To protect their rights under Federal law, Plaintiffs file this action against Defendants in their official capacity as Commissioners for the OTC under the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908) to obtain declaratory judgment and prospective

injunctive relief against the continued and unlawful assessment, levy, and collection of State taxes, including penalties and interest, from the income of Plaintiffs who both reside and earn that income from sources within the Choctaw Reservation. Plaintiffs also seek recovery of income taxes for Tax Year 2020 that was paid to Defendants under protest through a statutory process provided under Oklahoma State law.

## II.  JURISDICTION AND VENUE

1. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because Plaintiffs' claims are based on a Federal question under Article I, Section 8, Clause 3 of the U.S. Constitution (the "Indian Commerce Clause"), Article II, Section 2, Clause 2 of the U.S. Constitution (the "Treaty Clause"), Article VI, Paragraph 2 of the U.S. Constitution (the "Supremacy Clause"), Treaties between the United States and the Choctaw Nation (the 1830 Treaty of Dancing Rabbit Creek, Sep. 27, 1830, 7 Stat. 333; the Treaty of Doaksville, Jan. 17, 1837, 11 Stat. 573; the 1855 Treaty of Washington, June 22, 1855, 11 Stat. 611; the 1866 Treaty of Washington, Apr. 28, 1866, 14 Stat. 769), 18 U.S.C. § 1151, 25 U.S.C. § 1322, the Act of June 16, 1906, Ch. 3335, 34 Stat. 267 (1906) (the "Oklahoma Enabling Act"), and the federal common law relating to Indians.

2. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 to adjudicate Plaintiffs' claim under Oklahoma State law, 68 O.S. § 226, seeking to recover an unlawful tax assessment and amount paid to Defendants under protest, including recovery of any attorney's fees and other costs and expenses as provided in Section 226. The State law claim is related to this Court's original jurisdiction question of whether the State income tax is preempted under Federal law to form part of the same case or controversy under Article III of the U.S. Constitution.

3. Venue in the Eastern District of Oklahoma is appropriate under 28 U.S.C. § 1391(b)(2) because it is the judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred" and where "a substantial part of property that is the subject of the action is situated."

## III. PARTIES

4. Plaintiff Harold Meashintubby is an enrolled member of the Choctaw Nation of Oklahoma (the "Nation") and resides in McAlester, Oklahoma (Pittsburg County) located within the exterior boundaries of the Choctaw Reservation.

5. Plaintiff Nellie Meashintubby is the spouse of Harold Meashintubby, is an enrolled member of the Nation, and resides in McAlester, Oklahoma (Pittsburg County) located within the exterior boundaries of the Choctaw Reservation.

6. Defendant Shelly Paulk is the Chairperson for the OTC.

7. Defendant Mark Wood is the Vice-Chairperson for the OTC.

8. Defendant Charles Prater is the Secretary-Member for the OTC.

## IV. LEGAL FRAMEWORK

9. The State lacks jurisdiction to assess, levy, and collect taxes upon the income of Tribal members who both reside and earn that income from sources within the Indian country to which the Tribal member belongs. *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450 (1995); *Oklahoma Tax Comm'n v. Sac and Fox Nation*, 508 U.S. 114 (1993); *McClanahan v. Arizona*, 411 U.S. 164 (1973); see also Oklahoma Administrative Code 710:50-15-2(b)(1). However, this rule of law does not exist in a vacuum. It is supported by a foundation of other Indian law principles that existed well before *McGirt*, including application of Treaty rights and well-established Supreme Court precedent holding that States generally lack jurisdiction over Indians and Indian affairs in Indian country unless expressly allowed by Congress.

10. In the landmark Supreme Court case of *McClanahan v. Arizona*, 411 U.S. 164 (1973), the Court relied on certain fundamental Indian law principles articulated in *Worcester v. Georgia*, 6 Pet. 515 (1832) where the Court held there "this concept of Indian reservations as [being] separate, although dependent nations, [means] that state law could have no role to play within the reservation boundaries." The

*McClanahan* Court, in holding that Reservation Indians who both reside and earn income from Reservation sources were exempt from State income tax, relied on the *Worcester* reasoning even though *Worcester* was not an income tax case. The Court stated:

> Although *Worcester* on its facts dealt with a State's effort to extend its criminal jurisdiction to reservation lands, **the rationale of the case plainly extended to state taxation within the reservation as well**.

*McClanahan*, 411 U.S. at 169. (emphasis added). The *McClanahan* Court provides that the legal framework must begin with an analysis of the relevant Treat(ies) between the Tribe and the United States.

**A.     Treaties Between Choctaw Nation and the United States**

11.     The Choctaw Nation and other Indian tribes and nations once occupied the southern and southeastern parts of the United States. *Choctaw Nation v. Oklahoma*, 397 U.S. 620 (1970). Once the United States' policy was aimed at removing Indians lands west of the Mississippi, the government began negotiating and entering into treaties with the Indian tribes, including the Choctaw Nation, to provide the terms of removal for these lands.

12.     The 1830 Treaty of Dancing Rabbit Creek, Sep. 27, 1830, 7 Stat. 333 secured to the Nation "the jurisdiction and government of all the persons and property that may be within their limits west, so that no Territory or State shall ever have a right to pass laws for the government of the Choctaw Nation . . . and that no part of the land granted to them shall ever be embraced in any Territory or State." Art. IV.

13.     The Treaty of Doaksville, Jan. 17, 1837, 11 Stat. 573 permitted the Chickasaws to form "a district within the limits of their country, to be held on the same terms that the Choctaws now hold it, except for the right of disposing of it . . . " Art. I.

14. The 1855 Treaty of Washington, June 22, 1855, 11 Stat. 611 modified the western boundary of the Choctaw Reservation. Article Four of the 1855 Treaty made the Choctaw and Chickasaw governments independent of each other. The Treaty also guaranteed that "the Choctaws and Chickasaws shall be secured in the unrestricted right of self-government, and full jurisdiction, over persons and property . . ." Art. VII.

15. The 1866 Treaty of Washington, Apr. 28, 1866, 14 Stat. 769 contained an express reaffirmation of "all obligations arising out of treaty stipulations or acts of legislation with regard to the Choctaw and Chickasaw Nations." Art. X. The Choctaw right of self-governance was also reaffirmed in Article Seven by expressly providing that no legislation shall infringe on the Tribes' "rights, laws, privileges, or customs . . ." Art. VII.

16. Nothing in these Treaties limited the Nation's jurisdiction in the Reservation to only criminal matters or authorized State jurisdiction over Tribal members' income in the Reservation. In fact, the 1855 Treaty clearly guaranteed the Nation, not the State, with the "unrestricted right of self-government, and full jurisdiction, over persons and property" within the Reservation.

**B.    No Other Act of Congress Has Provided for State Taxation Authority Against Tribal Members' Income in the Reservation.**

17. In 1953, Congress enacted "Public Law 280" that allowed some states to assert limited civil and criminal jurisdiction in Indian country. "Public Law 280" was later codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321-26, 28 U.S.C. § 1360. The law as initially enacted delegated jurisdiction to six states and later offered any other state the option of accepting the same delegation of jurisdiction. A 1968 amendment made subsequent state assumptions of jurisdiction subject to consent by the Tribes. See 25 U.S.C. §§ 1321(a), 1322(a), & 1326.

18. The State of Oklahoma never accepted the delegation of jurisdiction in Indian country, and, subsequent to the 1968 amendment, the State has never obtained

Tribal consent to assert criminal and civil jurisdiction in Indian country. For purposes of this action, the State is thus acting the outside the authority provided by Congress by asserting civil/taxation jurisdiction in Indian country without Tribal consent as required by 25 U.S.C. § 1322.

19. The "Oklahoma Enabling Act," 34 Stat. 267 (June 16, 1906) (the "Enabling Act") was enacted by Congress to allow the people of the Oklahoma and Indian territories to form the framework for Oklahoma's statehood; however, nothing in the Enabling Act authorized State taxation jurisdiction over Tribal members' income in the Reservation. Rather, Congress imposed restrictions on State authority affecting Indians and Indian property. Section 1 of the Enabling Act provides:

> [N]othing contained in the said constitution [of Oklahoma] shall be construed to limit or impair the rights of person or property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise . . . .

Section 3 of the Enabling Act further provides:

> That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States.

20. All the above reflect no congressional authority or intent for the State to be able to tax the income of individual Choctaw Tribal members who both reside and earn that income within the exterior boundaries of the Choctaw Reservation.

## V.     FACTUAL ALLEGATIONS

### A.     The State's Own Actions Affirm *McGirt* Applies to Civil and Taxation Matters.

21.     On July 9, 2020, the U.S. Supreme Court in *McGirt v. Oklahoma* held that the Muscogee (Creek) Nation reservation boundaries were never disestablished by Congress and is Indian country under the definition provided at 18 U.S.C. § 1151. The Court thus concluded that the State of Oklahoma lacked criminal jurisdiction against an Indian for a crime that occurred within the Creek Reservation boundaries. However, under clearly-established Federal and State law, a reservation that is declared as Indian country within the meaning of Section 1151 will have both criminal and civil applications.[1] *See, e.g., California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 208 n.5 (1987); *Indian Country, U.S.A. Inc. v. Okla. Tax Comm'n.*, 829 F.2d 967, 973 (10th Cir. 1987); *State ex rel. May v. Seneca-Cayuga Tribe*, 711 P.2d 77, 82, 1985 OK 54 (Okla. 1985) (*citing DeCouteau v. Dist. Ct.*, 420 U.S. 425 (1975)).

### i.     Oklahoma Governor Invokes Civil Regulatory Provision Applicable for Oklahoma Indian Country.

22.     Soon after the *McGirt* ruling, State officials (including Defendants) took the formal position that there are civil and taxation ramifications in the reservations. On July 22, 2020, Oklahoma Governor Kevin Stitt wrote a letter to Andrew Wheeler, then-Administrator for the Environmental Protection Agency (the "EPA"). Citing *McGirt*, Governor Stitt requested the EPA approve the State to administer all EPA approved environmental programs in all areas of the State that are in Indian country pursuant to § 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation

---

[1] Also, a Federal Court in the Western District of Oklahoma recently issued an Order finding the Muscogee (Creek) Nation Reservation meets the definition of "Indian lands" under the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201, *et seq*. In so finding, the Court rejected the State's position that *McGirt* limited the Muscogee Reservation to only criminal matters under the Major Crimes Act. *State of Oklahoma, et al. v. U.S. Dep. of the Interior, et al.*, No. 5:21-cv-00719-F (W.D. Okla. Dec. 22, 2021).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 8

**Reservation Legal Solutions, PLLC**
P.O Box 1131
Okmulgee, Oklahoma 74447
(918) 752-0020

Equity Act of 2005 ("SAFETEA").[2] SAFETEA is a civil regulatory law governing the application of State environmental programs in Oklahoma Indian country. There would be no need for the Governor, relying on *McGirt*, to request the application of SAFETEA in Oklahoma Indian country if *McGirt* was limited to only criminal matters. A copy of the Governor's letter is attached as Exhibit "A."

23. On October 1, 2020, the EPA approves Governor Stitt's request. In its letter, the EPA Administrator refers to the definition of Indian country at 18 U.S.C. § 1151, and states "[a]lthough this definition is codified in the federal criminal code, it is also relevant for purposes of civil jurisdiction." The EPA letter further states, "As described in the State's July 2020 letter, the impetus for the State's request was the [*McGirt* decision]. In that case, the Supreme Court held that the Creek Nation's Reservation in eastern Oklahoma had not been disestablished by Congress and remained Indian country under federal law." A copy of the EPA Administrator's letter is attached as Exhibit "B."

### ii. Oklahoma Agencies Approve Intergovernmental Agreement for Indian Children on the Reservations.

24. On or about August 14, 2020, the State, by and through the State's Department of Human Services and Office of Juvenile Affairs, entered into a "Intergovernmental Agreement Between the State of Oklahoma and the Choctaw Nation of Oklahoma Regarding Jurisdiction Over Indian Children Within the Tribe's Reservation" (the "Agreement"). On information and belief, the Oklahoma Attorney General's office assisted with the development of the Agreement on behalf of the State. A copy of the Agreement is attached as Exhibit "C."

25. The Agreement was necessary due to provisions in the Indian Children Welfare Act ("ICWA") that provides Indian tribes with exclusive jurisdiction over child custody proceedings involving an Indian child that resides or is domiciled within a reservation. 25 U.S.C. § 1911(a). ICWA is a civil statute providing for the

---

[2] Public Law 109-59, 119 Stat. 1144 (Aug. 10, 2005).

protection and preservation of Indian families and children in Indian country. It is not a criminal statute. And nothing in ICWA is based on a premise that the reservation in question exists for only criminal purposes.

26. The Agreement was necessary after the *McGirt* ruling to preserve the status quo regarding child custody matters in the Reservation. The terms of the Agreement are based on ICWA provisions and clearly reference the Nation's Reservation. Part IV of the Agreement states: "The parties have agreed to enter into this jurisdiction sharing Agreement based on the premise that the Choctaw Nation of Oklahoma has exclusive jurisdiction over any child custody proceeding involving an Indian child domiciled within the boundaries of the Tribe's reservation as provided for in 25 U.S.C. § 1911(a)."

### iii. Oklahoma Tax Commission Report on Impact of *McGirt* to Taxation Matters.

27. Finally, on September 30, 2020, the Executive Director for the OTC released a "Report of Potential Impact of *McGirt v. Oklahoma*" (the "Report"). The Report was addressed to the Governor's Commission on Cooperative Sovereignty and focused on the Creek Reservation but also included analysis if the *McGirt* reasoning extended to the Reservations for the other Five Nations. A copy of the Report is attached as Exhibit "D."

28. The Report provided an in-depth analysis on the legal background and U.S. Supreme Court holdings providing for the State income tax exemption for Tribal Citizens and Members in Indian country. Nothing in the OTC's Report provided any analysis or Supreme Court precedent holding that the Creek Reservation could be limited to only criminal matters. In fact, just the opposite. The Report provided conclusory statements affirming that the impact of the *McGirt* ruling would definitely apply to State income tax collection.

The following are excerpts from the Report:

1. "Although *McGirt* arose from a criminal proceeding, the implications of the decision extent to many other areas of Oklahoma law, including the taxes and fees administered by the Oklahoma Tax Commission." Report, pg. 2.

2. "Although the *McGirt* Court limited its holding to defining the Creek Nation's 'Indian country" for purposes of the Major Crimes Act, the OTC cannot ignore the Court's clarification of the boundaries of 'Indian country,' as defined in 18 U.S.C. 1151(a), because Oklahoma law relies heavily on Section 1151 to define 'Indian country' for state purposes." Moreover, because the State's taxing power falls within its civil regulatory jurisdiction, the OTC must be cognizant of the federal limitations on such jurisdiction within Indian country." Report, pg. 4.

3. "*McGirt* plainly held that the Creek Reservation survived allotment and remains intact today. [cite omitted]. Therefore, the provisions of Oklahoma Administrative Code 710:50-15-22[3] now apply in all lands within the Reservation boundaries described in the Muscogee (Creek) Treaty of 1866. Consequently, the State may not tax the income of individual Creek Nation citizens who reside within the Reservation boundaries, to the extent that the income is generated within those boundaries." Report, pg. 8.

4. "The holding in *McGirt* was limited to defining only the Creek Nation's Indian country, stating that '[e]ach tribe's treaties must be considered on their own terms, and the only question before us concerns the Creek,' [cite omitted]; however, the OTC recognizes the potential for broader impact of the decision and a similar analysis may be applied to other tribes in the future." Report, pg. 13.

29. Despite the OTC's clear pronouncements in its Report, it has obviously altered its position on this issue. On December 7, 2020, the OTC General Counsel, Elizabeth Field, wrote in a letter to Blaine Peterson, President and CEO of the Oklahoma Society of Certified Public Accountants that *McGirt* was limited to criminal

---

[3] Oklahoma Administrative Code ("OAC") 710:50-15-2(a)(1) defines "Indian Country" as "formal and informal reservations, dependent Indian communities, and Indian allotments, the Indian titles to which have not been extinguished, whether restricted or held in trust by the United States. [See: 18 U.S.C. § 1151]" Further, OAC 710:50-15-2(b)(1) provides that the income of an enrolled Tribal member shall be exempt from Oklahoma individual income tax when "the member is living within 'Indian Country' under the jurisdiction of the tribe to which the member belongs; and, the income is earned from sources within 'Indian Country' under the jurisdiction of the tribe to which the member belongs."

matters and the "*McGirt* decision has not been expanded to apply to any civil matters, including taxation." Ms. Field also wrote that until a court expands *McGirt* to taxes, the OTC's administration or enforcement of the State's tax laws are not impacted. A copy of Ms. Field's letter is attached as Exhibit "E".

**B.      Despite Supreme Court Law, the State Administrative Code, and Defendants' Position in its Report, Plaintiffs' Claim for the Indian Country Exemption Is Denied by Defendants.**

30.     Plaintiffs are enrolled members of the Choctaw Nation. They reside in McAlester, Oklahoma, which is geographically located within the exterior boundaries of the Choctaw Reservation. And Plaintiffs' income for tax years 2017 and 2020 was earned from sources within the Reservation. See Affidavit of Harold and Nellie Meashintubby attached as Exhibit "F"

31.     Plaintiffs amended their Oklahoma Income Tax Return for Tax Year 2017 to claim the exemption on the basis they lived and earned income in 2017 from sources within the Choctaw Reservation.

32.     The OTC sent a letter, issued on June 3, 2021, responding to Plaintiffs' 2017 amendment and declared the "[e]xempt Tribal Income exclusion has been disallowed or adjusted" and included a tax balance due. The OTC letter did not provide a legal basis for denying the exemption based on Plaintiffs' residency and income sources being from the Choctaw Reservation. A copy of the OTC's June 3, 2021, letter is attached as Exhibit "G".

33.     Plaintiffs responded by timely filing with the OTC a protest letter, dated July 15, 2021, objecting to the OTC's decision to deny the exemption for Tax Year 2017 and request a formal protest under the Oklahoma administrative process. To date, Plaintiffs have not received any response from the OTC. A copy of Plaintiffs' July 15, 2021, protest letter is attached as Exhibit "H".

34. Plaintiffs filed their Oklahoma Income Tax Return for Tax Year 2020 and again claimed the exemption on the basis they lived and earned income in 2020 from sources within the Choctaw Reservation.

35. The OTC sent a letter, issued on October 19, 2021, responding to Plaintiffs' exemption claim for Tax Year 2020 and declared the "[e]xempt Tribal Income exclusion has been disallowed or adjusted" and included a tax balance due. The OTC letter did not provide a legal basis for denying the exemption based on Plaintiffs' residency and income sources being from the Choctaw Reservation. A copy of the OTC's October 19, 2021, letter is attached as Exhibit "I".

36. In response, Plaintiffs sent to the OTC Chairman a letter, dated November 12, 2021, and included a payment of the total tax due being paid under protest and included a notice of intent to file suit under Oklahoma law, 68 O.S. § 226 (the "226 Letter"). The 226 Letter was timely mailed within 30 days from the date of mailing to Plaintiffs and provided formal notice to Defendants of Plaintiffs' objections to the tax assessment, including any associated fees, penalties, and interest. A copy of the 226 Letter is attached as Exhibit "J".

37. Plaintiffs' 226 Letter was sent to Defendants within one year of the date of Defendants' assessment in accordance with Section 226.

38. As stated in Plaintiffs' 226 Letter, and as incorporated by this Complaint, Defendants' assessment, and collection of the State income tax against Plaintiffs are in violation of the Indian Commerce Clause, the Treaty Clause, the Supremacy Clause, the Treaties between the Choctaw Nation and the United States, 18 U.S.C. § 1151, 25 U.S.C. § 1322, the Oklahoma Enabling Act, and various rulings by the U.S. Supreme Court.

39. Despite paying the total tax due under protest under Section 226, Plaintiffs received a notice from the OTC demanding payment of the interest and penalty amounts due for Tax Year 2020. The OTC also threatened Plaintiffs with additional collection action including "referral to a third party collection agency, the issuance of a tax lien, wage garnishment, levy of your bank account, referral to the

Federal Treasury Offset Program (TOP), intercept of State refunds or overpayments, and/or additional collection and court cost fees applied to your unpaid tax balance." A copy of the OTC's collection letters, one dated December 15, 2021, and the second dated January 18, 2021, is attached as Exhibit "K".

## VI.   COUNTS

**COUNT ONE: Declaratory Judgment Under 28 U.S.C. § 2201**

40. Plaintiffs incorporate all allegations in the preceding paragraphs and further allege as follows:

41. As explained in this Complaint, the status of the Choctaw Reservation as Indian country under 18 U.S.C. § 1151(a) is not in question; however, Defendants' unprecedented position that the Reservation is limited to only criminal matters has caused undue burden and harm to Plaintiffs and other similarly situated Tribal members who rely on well-established Federal law addressing the parameters of criminal, civil, and taxation matters in Indian country.

42. For years prior to the *McGirt* decision, both Federal and State law recognized that Indian country status has both civil and criminal implications. Due to Defendants' actions, however, Plaintiffs find it necessary to file this action seeking a judicial declaration that the Choctaw Reservation is Indian country for purposes of preempting State taxation, including penalties and interest, upon Plaintiffs' income.

**COUNT TWO: Injunctive Relief**

43. Plaintiffs incorporate all allegations in the preceding paragraphs and further allege as follows:

44. Based on the Court's declaration in Count One, Plaintiffs request the Court issue a preliminary and permanent injunction against Defendants' unlawful

actions.  Plaintiffs will file with the Court a separate motion and supporting brief that fully outlines the basis for seeking prospective injunctive relief against Defendants' ongoing violations of Federal law based on the following:

      A.    Unless enjoined by the Court, Defendants will continue to exercise unlawful State civil and taxation jurisdiction in the Choctaw Reservation against Plaintiffs in violation of the aforementioned Treaties and other Federal law.

      B.    Defendants' unlawful actions are ongoing, and the injuries to Plaintiffs constitute irreparable harm.

      C.    There is no adequate and complete remedy at law to stop Defendants' unlawful actions against Plaintiffs.

45.    In the event the Court determines the Tax Injunction Act, 28 U.S.C. § 1341, or other rule of law applies to the income taxes in question, the Plaintiffs seek an alternative remedy of injunctive relief against the interest and penalties, in any form, upon Plaintiffs as the Tax Injunction Act does not apply to interest and penalties.

**COUNT THREE:  Recovery of Tax Paid Under Protest Pursuant to 68 O.S. § 226**

46.    Plaintiffs' action is also recognized under State law, 68 O.S. § 226, which affords a legal remedy and right of action in any State or Federal court where, as here, the taxes complained of are claimed to be in violation of the U.S. Constitution or other certain Federal law.

47.    Plaintiffs have complied with the provisions of Section 226 by timely sending to Defendants a notice of intent to sue along with a payment under protest of the income tax assessed for Tax Year 2020.

48.    The Court should find in favor of Plaintiffs' claims against the unlawful State taxation under the U.S. Constitution and other Federal law cited in this Complaint and order recovery to Plaintiffs of the income tax previously paid under protest along with a reasonable attorney fee and costs in accordance with Section 226.

The Tax Injunction Act does not apply to a party seeking recovery of taxes paid under protest in accordance with Section 226.

## REQUEST FOR RELIEF

WHEREFORE, premises considered, the Plaintiffs respectfully pray for judgment in their favor and against Defendants as follows:

(A) Pursuant to 28 U.S.C. § 2201, enter a declaratory judgment holding:

 (1) That the Choctaw Reservation is Indian country within the meaning and application of Federal law prohibiting Defendants from assessing, levying, and collecting taxes, including penalties and interest, upon the income of Plaintiffs, and;

 (2) That Plaintiffs are not subject to or required to pay taxes, including any applicable interest or penalties, to the State of Oklahoma, through the Defendants, upon the income earned by Plaintiffs from sources within the exterior boundaries of the Choctaw Reservation.

(B) Ordering a preliminary and permanent injunction restraining and prohibiting Defendants, and all their employees, agents, and those acting in concert or participation with them from assessing, levying, and collecting Oklahoma state taxes, including penalties and interest, upon Plaintiffs' income;

(C) Alternatively, if the Court determines the Tax Injunction Act or other rule of law prohibits relief against income taxes, the Court should order a preliminary and permanent injunction restraining and prohibiting Defendants, and all their employees, agents, and those acting in concert or participation with them from imposing and taking any assertive action against Plaintiffs to collect interest or to penalize Plaintiffs in any form, under any State law for unpaid taxes;

(D)     Enter a judgment against Defendants pursuant to 68 O.S. § 226 and order a recovery to Plaintiffs of income tax paid under protest for Tax Year 2020, and;

(E)     All other relief, legal or equitable, including attorney's fees and costs, as allowed by law and as the Court finds just and equitable.

Respectfully submitted,

By:   /s/ O. Joseph Williams
_____

**O. Joseph Williams, OBA # 19256**
**RESERVATION LEGAL**
**SOLUTIONS, PLLC**
The McCulloch Building
114 N. Grand Avenue, Suite 520
P.O. Box 1131
Okmulgee, Oklahoma 74447
Telephone: (918) 752-0020
Facsimile: (918) 894-6664
Email: jwilliams@reservationlaw-pllc.com

**ATTORNEY FOR PLAINTIFFS**
**HAROLD & NELLIE MEASHINTUBBY**

## VERIFICATION

STATE OF OKLAHOMA       )
                        ) ss
COUNTY OF Pittsburg     )

Harold Meashintubby, of lawful age, being first duly sworn upon oath, states:

That he is a named Plaintiff in the foregoing *Complaint for Declaratory and Injunctive Relief*, that he has reviewed the allegations in the *Complaint* and that he affirms the facts presented are true and correct to the best of his knowledge and belief.

Further Affiant Saith Not.

_____
HAROLD MEASHINTUBBY

Subscribed and sworn to before me, a Notary Public, on this 16th day of February 2022.

_____
Notary Public

My Commission Expires: 08/09/2023

## VERIFICATION

STATE OF OKLAHOMA                )
                                 ) ss
COUNTY OF Pittsburg              )

Nellie Meashintubby, of lawful age, being first duly sworn upon oath, states:

That she is a named Plaintiff in the foregoing *Complaint for Declaratory and Injunctive Relief*, that she has reviewed the allegations in the *Complaint* and that she affirms the facts presented are true and correct to the best of her knowledge and belief.

Further Affiant Saith Not.

_____
NELLIE MEASHINTUBBY

Subscribed and sworn to before me, a Notary Public, on this 16th day of February 2022.

_____
Notary Public

My Commission Expires: 08/09/2023